## TALCOTT H. RUSSELL, RECEIVER, vs. WILLIS BRISTOL AND ANOTHER, EXECUTORS.

A life insurance company was authorized to establish a guarantee fund not exceeding $100,000, in approved notes, to be used only for the purpose of paying claims, and any part so used to be refunded out of the first surplus receipts of the company. Such a fund was raised by subscriptions of the individual shareholders under an agreement of the company that it was not to be resorted to until all the resources of the company were exhausted. Held that the fund could not be reckoned with the assets of the company in determining whether it was solvent.

And held that a vote of the directors declaring a dividend, which was founded upon a surplus created by treating the fund as an asset when the company was otherwise insolvent, with a vote calling in an installment of the same amount on the capital stock, it being intended that the dividend so declared should pay the installment on the stock, was illegal and of no effect.

A life insurance company was authorized to commence business when $100,000 was subscribed to its capital. After $113,000 had been subscribed B made a final subscription as "treasurer, in trust." The company at once organized and elected directors, and the directors appointed B treasurer. The directors, a majority of whom were the same corporators who had accepted the subscription, afterwards by repeated acts, before issuing any policies, recognized the subscription as made by B as treasurer for the insurance company itself. Held that this constituted a ratification of B's authority to subscribe for the company, and that neither the company during its solvency nor a receiver appointed upon its insolvency, could hold B liable individually upon the subscription.

And held that it did not affect the case that the company might not have power to subscribe for its own stock; the only question being whether it had actually authorized or ratified the act of B.

Russell *v.* Bristol.

The statute (Gen. Statutes, tit. 18, ch. 11, part 3, sec. 5,) provides that "when a right of action shall accrue after the death of the deceased, it shall be exhibited within twelve months after such right of action shall accrue." The court made an order, after the death of *B*, for the payment to a receiver of subscriptions to stock on a future day named, and the receiver enclosed a certified copy of the order to the executors, with a written demand for payment at the time fixed by the order. Held that it was no objection to the presentation that the right of action had not then accrued. A presentation before a claim matures is sufficient.

ASSUMPSIT upon subscriptions to the stock of a life insurance company, made by Willis Bristol, of whom the defendants were executors; brought to the Superior Court in New Haven County. The defendants pleaded the general issue, with notice that they should offer evidence to show that the cause of action accrued more than six years before the suit was brought and that the claim was not presented against the estate of the deceased within the time prescribed by the statute. The following facts were found by the court:

On the 13th of September, 1871, subscriptions were made to the amount of $125,000 to the capital stock of the American National Life & Trust Company, of New Haven, Connecticut, the first of which was made by Willis Bristol in his individual capacity for one hundred shares, amounting to $10,000, and the last for one hundred and twenty shares, amounting to $12,000, in the following form:—

"Willis Bristol, Treas. in trust—120 shares—$12,000."

By its charter the company was empowered to carry on the business of life insurance, and to commence business when $100,000 of capital had been subscribed.

At the time of the organization of this company there was and for several years had been in existence a life insurance company, carrying on business in New Haven, called the American Mutual Life Insurance Company. Willis Bristol had been from some time prior to 1865 the treasurer of this company, and on the organization of the American National Life & Trust Company, upon the same day that the above subscriptions were made, he was elected one of the directors and treasurer of that company.

The directors chosen had most of them been corporators under the charter. The principal stockholders and managers of the two companies were the same.

By an act passed July 27th, 1871, all life insurance companies were required to make annual returns to the insurance commissioner, by March 1st, of their condition at December 31st preceding, and he was required to put the re-insurance reserve at four per cent. compound interest. The American Mutual Life Insurance Company, on April 16th, 1872, made its report as of December 31st, 1871, showing it had outstanding one thousand and fifty policies, of a total of $1,760,750. Upon the face of this statement, and in. fact, the company was insolvent to an amount exceeding $48,000, and the commissioner thereupon, on May 10th, 1872, found it insolvent under the four per cent. rule, and at once notified the company thereof, and that it must stop issuing new policies, and the company did not issue any new policies after July 5th, 1871.

On the 13th of March, 1873, B. Noyes, president of this company, at a meeting of the trustees at which Willis Bristol was present, reported that while under the five per cent. rate of interest which had formerly been adopted, the company would have a surplus of $50,000 over its policy liabilities, it was insolvent under the new four per cent. rule, and thereupon the board voted to establish a guaranty capital of $75,000, and to set this and all their assets as of December 31st, 1872, over to the American National Life & Trust Company, upon the latter company agreeing to assume the payment of all the policies of the American Mutual Life Insurance Company and its other liabilities as of that date.

An amendment of the charter of the American Mutual Life Insurance Company, passed the year before, authorized its board of trustees to establish "a guarantee capital or fund, not to exceed the sum of $100,000 at any one time, in approved notes," with the following further provision: "And the same shall be negotiated or assessed only for the purpose of paying claims against said company, and if it

shall be necessary at any time for the board of trustees to assess, negotiate or collect any part or portion of said notes, the amount thus obtained shall be refunded and be paid out of the first surplus receipts of said company, with interest at the rate of six per cent. per annum."

The form of the guaranty agreed upon and adopted was as follows :—

"NEW HAVEN, March 15, 1873.

"Whereas, the board of trustees of the American Mutual Life Insurance Company have resolved to establish a guarantee capital amounting to seventy-five thousand dollars, under the provisions of the charter of said company and the amendments thereto, and to pay for the use of the same as follows: three per cent. each on the first day of July and the first day of January in each year, for the term of three years; and whereas, it is agreed that said guarantee capital shall not be used or resorted to unless all the resources of said company are exhausted, and that whatever income is derived from the bonds, stocks or mortgages, or other securities transferred to said company as a part of said capital, shall be, when collected by the treasurer of said company, paid to the owners thereof, and the securities themselves be surrendered at the termination of said three years from the 15th day of December, 1872:— Now, therefore, we, the undersigned, do hereby subscribe for such amount of said guarantee capital as we respectively set opposite to our names, subject to the terms of said charter and this agreement, and hereby agree to transfer to said company such securities, to the amount of our respective subscriptions, as shall be approved by the board of trustees. And further, we hereby consent that said American Mutual Life Insurance Company may transfer our said securities to the American National Life & Trust Company, whenever said company shall assume the liabilities of said American Mutual Life Insurance Company, as provided in certain special acts of the legislature heretofore passed."

For each of these subscriptions the following receipt was given by the treasurer of the company :—

"Received, March        , 1873, from
in payment of his subscription of                    dollars
towards a guarantee capital of seventy-five thousand dollars
for the American Mutual Life Insurance Company, the
following securities:   *   *   *   to be used as a part of said
guarantee capital, according to the tenor of said subscrip-
tion, and for no other purpose; and all obligation on the
part of the subscriber herein named shall cease at the
expiration of three years from the 15th day of December,
1872. And said American Mutual Life Insurance Company,
or their successors, agree to pay over to        ·
whatever income or interest may be paid or realized upon
the aforesaid securities as fast as the same is received, and
six per cent. per annum for the use of the same, namely, on
the first days of July and January, and to return said
securities at the expiration of said term of three years."

Willis Bristol agreed to subscribe $10,000 to this capital,
and delivered to himself as treasurer of this company a
certificate for two hundred shares of the Morris & Essex
Railroad Company's stock of the par value of $10,000 under
that agreement. He also received securities for the same
purpose from the other subscribers, and the whole $75,000
was made up prior to March 22d, 1873, on which day the
directors of the American National Life & Trust Company
at a meeting at which he was present, received and accepted
the transfer as proposed by the company, and agreed to
assume the payment of the policies and other liabilities of
the American Mutual Life Insurance Company.

On the 18th of April, 1873, the insurance commissioner
made an examination at New Haven as to whether the
American National Life & Trust Company was duly organ-.
ized, and was shown the original subscription list for
$125,000 of its capital stock, and thereupon issued his
certificate that it was duly organized pursuant to its charter
and might lawfully commence the business of life insurance.
The company did not issue any policies before June of that
year.

On May 17th, 1873, at a meeting of the directors of the

American National Life & Trust Company, at which Mr. Bristol was present, the following votes were passed:—

"*Resolved*, That an installment of 23 per cent. on $110,000 of the capital stock of this company is hereby required to be paid to the company on or before the 5th day of June, 1873.

"*Resolved*, That a dividend of 23 per cent. from the surplus of this company be and is hereby declared to be paid to the holders of $110,000 of the capital stock payable on the 5th day of June, 1873.

"*Resolved*, That the subscription of $12,000 of trust stock by the treasurer to the capital stock of this company be and is hereby made vacant and surrendered, said amount being in excess of the amount required to be subscribed and not needed for the use of the company."

To make out the surplus referred to as existing in one of the foregoing votes, an insurance building owned by the insurance company, having been built on land of which it held a lease for sixty years, was reckoned at $350,000, and the guaranty capital at $75,000, among the assets of the company, and the re-insurance reserve was taken at the valuation established by the insurance commissioner, under which he had found the deficiency on the part of the American Mutual Life Insurance Company.

The surplus as estimated was not predicated upon any new business done by the company, but made upon the basis of the assets and liabilities inherited from the old company, the guaranty capital being called an asset of $75,000, and as exceeding the previous deficiency of over $48,000 and leaving a balance after satisfying the same of over $26,000.

It was not expected by the American National Life & Trust Company that any of the stockholders would pay the twenty-three per cent. assessment laid by the vote, otherwise than as the same might be paid by the twenty-three per cent. dividend, and it did not appear that any notice, call or demand other than by said vote, was ever made upon Mr. Bristol or any other stockholder for payment of the

assessment; nor that any assessment was ever paid under the vote otherwise than it might be deemed paid by said twenty-three per cent. dividend. This dividend could not have been paid without either taking it out of the guarantee capital or the other capitalized assets of the company.

It was claimed by the plaintiff, but not proved, that the directors at the time of declaring this dividend knew or had good reason to believe that the company was insolvent.

The call and the simultaneous declaration of a dividend, if voted, had the effect of reducing the liability of the stockholders of $110,000 of the capital stock so as to preclude any further calls exceeding seventy-seven per cent. of their original subscription for $125,000. But it was not proved, as the plaintiff claimed, that the votes passed May 17th, 1873, were fraudulent as respects the creditors of the company, nor that it was intended by Mr. Bristol and the other directors present at the meeting, to defraud such creditors, and there was no fraud on the part of the directors in passing the votes unless it arises upon the facts herein found.

The subscription of " Willis Bristol, Treasurer in trust, 120 shares," was never treated by the company as an obligatory subscription to the capital stock, or as being part thereof, otherwise than appears by the facts herein found, and was never included in any return made by the company to the insurance department.

On or about March 26th, 1873, sundry transfers of stock were made on the books of the company, and Mr. Bristol received thereby on that day a transfer of thirty-three shares from J. B. Robertson and one share from H. D. Walker. A short time prior to that date there was an agreement between the stockholders who were parties to the transfers, that the same should be made for the purpose of giving to each of the subscribers to the $75,000 guaranty capital of the American Mutual Life Insurance Company, a number of shares in the American National Life & Trust Company proportioned to their respective subscriptions to the guaranty capital. These transfers were made in pursuance of

that agreement and to carry it into effect, and secured to each subscriber of $5,000 to the guaranty capital sixty-seven shares of stock of the American National Life & Trust Company, and one hundred and thirty-four shares to each subscriber of $10,000. The 120 shares subscribed by Willis Bristol, treasurer in trust, was excluded from the apportionment as forming no part of the capital stock.

The American National Life & Trust Company made on March 21st, 1874, an annual report as of December 31st, 1873, and has made none since. Neither the American Mutual Life Insurance Company's report as of December 31st, 1871, nor any of the annual reports sent in by the American National Life & Trust Company, were such as were required by law.

Willis Bristol died May 8th, 1875, leaving a will, which was duly probated in the probate court for the district of New Haven on the 12th of May, 1875. The defendants were on the same day, duly qualified as executors of the will, and six months from the 12th of May was limited and allowed by the court of probate for the exhibition of claims against the estate. On the 10th of January, 1876, an inventory was filed by the executors and accepted and recorded, showing—in real estate, $76,850.00; in personal estate, $200,583.50; in credits considered good, $15,288.41; total, $292,721.91. No mention was made in the inventory of any shares in the capital stock of this company, and no such stock or certificate thereof ever came to the possession or knowledge of the executors. The estate was settled as a solvent estate, and on the 24th of May, 1876, the executors, under an order of the court, returned to the court a distribution of the estate, which was accepted, and the settlement of the estate closed.

The facts with regard to the presentation of the claim of the receiver to the executors of Willis Bristol are as follows:

On the 13th of January, 1879, the Superior Court in New Haven County made the following order, in the matter of the American National Life & Trust Company:—

"Upon motion of the insurance commissioner for an order

specially calling in the payment of the several subscriptions made to the capital stock and funds of said company, and prescribing the terms and manner of such call, it is found by the court, upon due inquiry, that the receiver of said company has not been able, though making diligent search therefor, to find the original subscription papers or books, or directors' record books, or by-laws of said company, or to ascertain whether said subscriptions or by-laws specified any particular terms or mode of calling in payment of such subscriptions; and it is further found that it is now necessary to call in full payment thereof, in order to meet claims of creditors and policy holders of said company; and thereupon it is hereby ordered that full payment of the entire amount of all subscriptions, heretofore made to the capital stock and funds of said company, and remaining unpaid, be and the same hereby is called for, and required to be made to the receiver of said company on or before the 15th day of March, 1879; and said receiver is hereby directed to call in the same, by serving a copy, certified by him, of this order, on every person liable on any such subscription, on or before the 15th day of January, 1879; such service to be made by leaving said copy with each personally, or by leaving it at his abode, or by depositing it in the post office, properly addressed to him, postage prepaid. And said receiver is hereby directed to collect all subscriptions, not paid as required by the above call and notice, by course of law."

A certified copy of this order was on the same day enclosed by the receiver to the executors, with the following letter:—

"GENTLEMEN—You will see by the enclosed copy of the order that the Superior Court has called in the capital stock of the American National Life & Trust Company. You will please take notice that I have been appointed by said court receiver of said company, and that I hereby demand of you and each of you as executors of the estate of Willis Bristol, deceased, payment of the full amount of stock held by him during his life in said company, being

one hundred and thirty-four shares held by him in his individual name, and one hundred and twenty shares which appear to have been held by him as trustee, said shares being one hundred dollars each, and amounting in all to $25,400; payment of said sums to be made to me as receiver of said company on or before the fifteenth day of March, 1879. You will further take notice that I hereby present said demand as a claim against the estate of Willis Bristol, deceased."

The claim was not otherwise presented against the estate. The suit was commenced August 1st, 1879.

Upon these facts the case was reserved for the advice of this court.

*S. E. Baldwin* and *T. H. Russell*, for the plaintiff.

*First.* As to the statute of limitations. It does not commence to run till after the claim becomes due. Subscriptions to capital stock do not become due until after a call; and, with the exception of the 23 per cent. call, the validity of which will be discussed further on, no call was made prior to January 13th, 1879. Thompson on Stockholders' Liabilities, §§ 250, 282; *Davis* v. *Weed*, 44 Conn., 569. As no call, with the exception of the 23 per cent., was made prior to the settlement of the estate, no claim was due before that time: therefore none could be presented. In such cases the settlement of the estate does not bar the claim. *Griswold* v. *Bigelow*, 6 Conn., 258; *Hawley* v. *Botsford*, 27 id., 80; *Bacon* v. *Thorp*, id., 251; *Davis* v. *Weed*, 44 id., 569; *Davis* v. *Vansands*, 45 id., 600.

*Second.* The presentation of the claim. It is said by the defendants that the claim was not exhibited within twelve months of the time when the right of action accrued. But the words "right of action shall accrue," in the statute, must be construed in connection with the other provisions of the law in connection with this subject. They mean only that the claim shall have become fixed and certain. No form of exhibition is required, but simply a notice which suffices to give knowledge to the executors. And the claim once

exhibited is always exhibited. *Pease* v. *Phelps*, 10 Conn., 62, 66. The notice recited in the record is an exhibition of the claim on March 15th, as by its terms it is a demand only as of that date.

*Third.* The subscription of Mr. Bristol for one hundred shares in his own name is clearly binding upon his estate. The subscription refers to the charter of the company, and must be read as if all the provisions of the charter were incorporated in it, and the simple subscription constitutes a liability. *Hartford & N. Haven R. R. Co.* v. *Kennedy*, 12 Conn., 499; *Mann* v. *Cook*, 20 id., 178. The fact that no certificate ever came to the knowledge or possession of the executors is wholly immaterial. And the executors could not relieve themselves from liability by refusing to inventory the stock. Even if Bristol himself had had no certificate, it could not vary the obligation, which was perfect from the moment of the subscription and acceptance.

*Fourth.* The $12,000 " Treas. in trust" subscription bound Mr. Bristol personally. " It is elementary law that an agent must so contract as to bind his principal, or he will be himself bound." *Hall* v. *Bradbury*, 40 Conn., 37; *Sterling* v. *Peet*, 14 id., 245. This doctrine is particularly applicable to stock subscriptions. *Griswold* v. *Seligman*, 72 Misso., 110; *Johnson* v. *Laflin*, 5 Dillon C. Ct., 65. The burden of proof is on the defendants to show that some one else is bound. The addition of the words " Treas. in trust " has no effect on the liability of himself or his estate to creditors, or to their representative the receiver. The party who subscribes as trustee is personally liable, and must look to his " *cestui que trust* " for compensation. Thomp. Stock. Liab., §§ 105, 177; *Wilbur* v. *Stockholders*, 18 Nat. Bank Reg., 178; *Preston* v. *Grand Collier Dock Co.*, 11 Sim., 327, 347; *Chapman's case*, L. R., 3 Eq., 364; *Ex-parte Oriental Bank*, L. R., 3 Ch. App., 791; *Pullman* v. *Upton*, 96 U. S., 329; *Griswold* v. *Seligman*, 72 Misso., 110; *Phœnix Warehousing Co.* v. *Badger*, 67 N. York, 294; *Hoare's case*, 2 Johns. & Hem., 229; *Allibone* v. *Hager*, 46 Penn. St., 48; *State ex rel. White* v. *Ferris*, 42 Conn., 560.

The words "Treas. in trust," cannot be supposed to refer to the American National Life. & Trust Co., because that company had no existence; and if it had been in existence, could not have subscribed for its own stock, or even have held its own stock. Thomp. Stock. Liab., §§ 125, 234; *Hope* v. *International Financial So.*, L. R., 4 Ch. Div., 327. However this may be, in the present case we have nothing to do with the parties for whom Mr. Bristol signed in trust, if there were any. Their liability must be settled in a suit between them and the Bristol estate. Mr. Bristol not only made this $12,000 subscription, but as a corporator participated in the acceptance of it, and found it to be valid. This finding must be regarded as final, especially as he must have known all the facts. *Litchfield Bank* v. *Church*, 29 Conn., 137; *Lane* v. *Brainerd*, 30 id., 575; *Saugatuck Bridge Co.* v. *Town of Westport*, 39 id., 347; *Marlborough Branch R. R. Co.* v. *Arnold*, 9 Gray, 159. If the stock was not returned to the insurance department, that fact would make no difference. Thomp. Stock. Liab., §§ 148, 149; *Sanger* v. *Upton*, 91 U. S. Reps., 63; *Dent's case*, L. R., 15 Eq., 407.

*Fifth.* The "Treas. in trust" subscription could not be vacated. The subscription list was spread on the record in full, and was acted upon in the fullest possible manner before any attempt to vacate any stock. The company was organized and licensed thereon, and received a transfer of a large quantity of assets from the American Mutual Life Ins. Co. It also contracted other large obligations. After all this had taken place, it was too late to vary the original subscription. Such facts raise an estoppel of the very highest nature known to the law. *Calhoun* v. *Richardson*, 30 Conn., 210; *Salmon* v. *Richardson*, id., 360. The capital stock of a corporation is a trust fund for the benefit of creditors, and cannot be dealt with by the corporation or its directors in such a way as to defeat the rights of creditors. Thomp. Stock. Liab., §§ 10, 11 and note, 195, 196, 201. The contract of subscription is not under the control of the corporation or the board of directors for that purpose. Id.,

§§ 196, 201. Two classes of persons had a special interest in this subscription, the other stockholders and the creditors. Neither of these classes had any notice or took any part in the vote to release. Every share of stock vacated made it more certain that the balance of the subscriptions must be paid in full; and that even this might not suffice to pay the company's obligations. Such a release is fraudulent in law, if not in fact, and therefore void. Id., §§ 10, 11, 105, 196, 201. It will not do to say that there was enough capital stock to justify the commissioner's certificate. It does not appear what one hundred thousand dollars was taken as the basis of his certificate.

*Sixth.* The twenty-three per cent. dividend. This dividend was fraudulent and void. The company was insolvent by a large amount, and there was, therefore, no surplus. The pretended dividend, therefore, was money belonging to the creditors of the company, and which the directors could not take away from them. *Alford* v. *Miller*, 32 Conn., 543, 545. The guaranty capital was included at seventy-five thousand dollars to make up the surplus. If the other assets had been taken at the company's valuation, but the guaranty capital left out, there would have been a deficiency on the company's own showing of about fifty thousand dollars. But it is perfectly evident that this fund, which could be resorted to only to pay claims, was an asset only as regards creditors, and was a liability as regards the company and its stockholders. Dividends could not be declared out of it, and the directors must have known that that was the case. The dividend also was not based upon any new business done by the company, or any profits, but simply on the assets received from the American Mutual Life Insurance Co. It was therefore declared out of the capital, not the profits of the company. This was clearly contrary to the provisions of the charter, and to all law. Thomp. Stock. Liab., §§ 11, 18, 207 and note.

*Seventh.* The twenty-three per cent. call. This did not operate to bar to that amount the demand now made. The call itself was but a part of a fraudulent scheme to reduce

the liability on the stock by distributing the capital assets to the stockholders. The call and the dividend were part of one transaction, having that end in view. It was never paid and never expected to be paid. No notice of it was ever given or demand upon it, made. The call and dividend were for the same amount, payable at the same time, and cancelled one another. The law will not permit parties, standing in the position in which Mr. Bristol stood, to take advantage of their own acts or frauds. to the injury of the rights of creditors. *Mann* v. *Cook*, 20 Conn., 178.

*J. S. Beach* and *H. Stoddard*, for the defendants.

*First.* No personal liability attached to Willis Bristol upon his subscription as "treasurer in trust." If such a liability attached it must rest upon, either, a contract to take and pay for these shares in his individual capacity; or, an estoppel *in pais* forbidding him to deny that he made such a contract; or, an individual liability created by statutory enactment.—(1.) To create a liability founded upon a contract, the minds of the parties must have met upon an agreement that Mr. Bristol should receive and pay for, and the corporation deliver, the 120 shares of stock. The facts found clearly show that the minds of the parties never met upon any such agreement. When Mr. Bristol headed the subscription list by putting down his name, "Willis Bristol, 100 shares, $10,000," he did not intend to subscribe for 220 shares, $22,000. He meant to assume individual liability for 100 shares, and no more. When at the end of the list he put down his name "Willis Bristol, Treasurer in trust, 120 shares," he demonstrated an intention to distinguish between the liability he assumed for the 100 shares by disclaiming his individual liability for the 120 shares. It is patent on the record that the corporation never claimed or thought of claiming that Mr. Bristol was under any individual liability to pay for these 120 shares. They never treated these shares as any part of their capital stock, either in the management of their affairs or in their returns to the insurance department. In the transaction of March,

1873, before the company did or could commence business under its certificate of April 18th, 1873, the corporation treated Mr. Bristol as the owner of 100 shares only, and as entitled in the apportionment of stock then made to 34 more shares *because* he only owned 100. In the words of the finding, the 120 shares were "excluded from said apportionment as forming no part of the capital stock." In addition to this the corporation took the earliest opportunity at their first meeting after they received their certificate of organization, and before issuing a single policy, to make the record clear by a recorded declaration that these shares did not form any part of their capital stock.— (2.) As to an estoppel. There are no facts found under which Mr. Bristol if living would be estopped to rely upon the real transaction and to deny his individual liability to pay for these shares. He would not be estopped as against the corporation, for it has always admitted, and acted upon the admission, that they were no part of its capital stock. He would not be estopped as against the public by reason of his having permitted the corporation to represent to the insurance department that these shares were part of its capital stock, for no such representations were ever made. He would not be estopped as against creditors. There were none existing at the time these shares were formally wiped out. This was done in May, 1873. No policies were issued until June, 1873.—(3.) There is no statute in Connecticut which by arbitrary enactment would, if Mr. Bristol was living, impose upon him individual liability for these shares by reason of their appearing upon this subscription in his name as treasurer in trust. Herein this case differs from the cases cited and relied upon by the receiver from the English and from some of the American reports. In England the "Companies Act" of 1862 forbids the registrar to receive or enter on the register notice of "any trust express or implied." The court in *Chapman's case*, L. R., 3 Eq., 361, says:—"One of the objects of that section was to free not only the company but creditors also from the responsibility of inquiring after other persons for whom

the shares are held. These gentlemen have agreed that their names shall be placed upon the list for the purpose of informing the world that they are the owners of the shares. The *trust on behalf of the company is not to appear*, and they have agreed to put themselves in the position of persons who have undertaken to contribute to the debts of the company." So that, as to all corporations organized since 1862, no question could arise as to the legal effect of holding shares in trust where the existence of the trust appeared in the register. And it will be found that all the authorities cited by the receiver involving questions of liability in such cases, are those wherein the shareholder appeared on the books of the company to be the *absolute* owner of the shares standing in his name. In these cases the effort of the shareholder was to escape liability by setting up the claim of a secret trust between himself and the real owner. This the courts say cannot be done for the reason that " he has put his name upon the list," not as showing that he holds the shares in behalf of some one else—for the statute forbids that—but "for the purpose of informing the world that he is the owner of the shares." But the remarks of the court in *Saunder's case*, 2 De G. J. & S., 109, show that it would take our view of the matter if such a requirement of the statute did not exist. The English cases cited by the receiver as to the liability of persons holding shares in trust in companies organized *prior* to the Companies Act of 1862, have still less application, because all such companies were not corporations but partnerships. *Morgan's case*, 1 Macn. & G., 225. The case pressed upon the attention of the court as a decision adverse to us, (*Hoare's case*, 2 Johns. & Hem., 229,) was that of such a corporation, in which the articles expressly provided that no trust should be recognized, while the statute known as the " winding up act " provided that all persons receiving dividends should be held to be members. The company was ordered to be wound up. The trustee had *received and receipted for dividends*, and under the covenants of the deed of settlement and the stringent enactments of the statute, the court rightly held the trustee

to be a member of and a shareholder in the company, and liable to contribute to the payment of its debts. The distinction between that case and the one at bar is too wide to need comment. Unless the search made on the other side has been more successful than ours, no American case can be found in which it has been even claimed that a person could be held individually liable when the books of the corporation disclosed that he was a mere trustee for a named *cestui que trust* except in cases (if there be such) where the liability was imposed by statutory enactment. Cases are cited by them to show that a transferee of stock is liable as a stockholder although he holds the stock only as collateral security. But in no case has a creditor holding stock as collateral been held liable when the trust appeared on the books of the corporation. On the contrary, in several of the cases cited, the court say that where the existence of the trust appears upon the face of the usual evidence of ownership there is no such liability on the part of the trustee. *Adderly* v. *Storm*, 6 Hill, 624; *Bank of Barre* v. *Bingham Manufacturing Co.*, 127 Mass., 563. The principle making the nearest approach to that involved in this case is stated in Angell & Ames on Corporations, § 622:—"A corporation may hold its own stock unless forbidden by the charter, but cannot authorize the trustee who holds it to vote upon it. During the period it is owned by the company it is deemed merged." In *American Railway Frog Co.* v. *Haven*, 101 Mass., 399, four hundred shares of the capital stock were transferred and charged to Clark as treasurer of the corporation "to hold for the benefit of the corporation." The court say:—"By the terms of the transfer Clark holds 'for the benefit of the corporation' and of course subject to its order. This is the extent of his trust. Nothing in the nature of it makes it necessary that he should vote as the holder of those shares. There is no apparent reason why he, not being beneficially or *practically the owner of them*, should be endowed with the privilege of controlling 400 votes according to his own judgment or pleasure." See also *Wilson* v. *Proprietors of Central Bridge*, 9 R. Isl., 590; *Ex parte Holmes*, 5 Cowen, 426.

*Second.* The call for an installment of twenty-three per cent. on the 134 shares. On the 17th of May, 1873, at a meeting of the directors, it was voted "that an installment of 23 per cent. of the capital stock of the company is hereby required to be paid to the company on or before the 5th day of June, 1873." And at the same meeting it was also voted "that a dividend of 23 per cent. from the surplus of this company be and hereby is declared, to be paid to the holders of $110,000 of the capital stock, payable on the 5th day of June, 1873." The court finds that "it was claimed by the plaintiff, but not proved, that the directors at the time of declaring this dividend knew or had good reason to believe that the company was insolvent." Also that "there was no fraud on the part of the directors in passing said votes, unless it arises on the facts herein found." But no facts are found inconsistent with those upon which the court found as matter of fact that "there was no fraud on the part of the directors in passing said votes." If the installment is not to be regarded as paid, the claim to it by the receiver is barred by the statute of limitations. More than six years elapsed between the maturity of the call, June 5th, 1873, and the institution of this suit, August 1st, 1879. Six months from the 12th of May, 1875, was the period limited by the probate court for the exhibition of claims against the estate. If any such claim now exists, it existed, (the call being made in good faith and without fraud,) at the time of the death of the testator. It was not presented against the estate within the time limited and is "forever barred" as a claim against his estate. Gen. Statutes, p. 388, sec. 5.

*Third.* The receiver has no legal hold on the estate for the remaining seventy-seven per cent. on the 134 shares. The testator died May 8th, 1875. Executors were appointed May 12th, 1875, and six months from that date were limited for the presentation of claims. The inventory was filed January 10th, 1876. The estate was settled as a solvent estate, and on the 24th of May, 1876, the executors under an order of the court returned a distribution of the estate,

which distribution is made part of the record. No claim was ever presented against the estate by the insurance company. The only claim presented against the estate by the receiver was by his letter of January 13th, 1879, which was addressed to the executors. It referred them to an enclosed copy of an order of the Superior Court calling for payment of the entire amount of the capital on or before March 15th, 1879, and demanded that payment be made in accordance with the order to him. The only theory upon which this claim can be enforced against the estate is found in section fifth of Revised Statutes, page 388 :—" When a right of action shall accrue after the death of the deceased it shall be exhibited within twelve months after such right of action shall accrue, and shall be paid out of the estate remaining after payment of the debts exhibited in the time limited." The preceding section of the same statute reads: " If any creditor shall neglect to exhibit his claim within such time as shall be limited  *  *  he shall be forever debarred of his demand against such estate." It is found that neither this creditor nor those whom he represents presented any claim against the estate during the period limited. *Primâ facie* therefore it is barred. Two elements must concur to remove the bar. 1st. The right of action must have accrued after the death of the testator. 2d. It must have been exhibited against the estate at some time within twelve months after such right of action accrued. If we concede that this right of action has the first of these two elements, it must also be conceded that it has not the second element. The right of action did not accrue until the 15th day of March, 1879. If Mr. Bristol had been living no suit could have been legally brought against him before that date. It was not exhibited against the estate on that day or within twelve months thereafter. The only exhibition of any supposed cause of action made by the receiver was several weeks before any cause of action had accrued. This is not a mere technical objection. If it was, it would be quite legitimate to interpose it. But it is not. The omission to exhibit the claim after the right of action

had accrued is in accord with the allegations of the declaration. The declaration avers a promise on the part of the executors. No express promise is found by the court below; the receiver must therefore recover, if at all, upon the implied promise. This implied promise is supposed to originate in the liability of the executors to pay the call when it matured. It sets out a call made in January, 1879, to become due March 15th, 1879, a notice of such approaching maturity given February 1st, 1879, and avers that the defendants as executors "on the 1st of February, 1879, became bound to pay and promised the plaintiff to pay to him as such receiver said sum on the 15th of March, 1879, with interest from the time when the same should become payable as called for." Even at common law there could not be any recovery under these allegations. It is the duty of an executor having assets to pay matured claims, and therefore the law raises an implied promise after maturity to pay. But it is no part of his duty, even at common law, to anticipate, and by anticipation pay, claims that have not matured, and therefore the law raises no implied promise as made by him before maturity.

PARDEE, J. The American National Life & Trust Company of New Haven having prior to September 13th, 1871, received a charter giving it permission to commence business whenever capital stock to the amount of $100,000 should be subscribed, the corporators met on that day, organized, opened a book for subscriptions, received and accepted them to the amount of $125,000, and closed it. In it Willis Bristol made two subscriptions in form as follows:—

"Willis Bristol ———— 100 shares $10,000."

"Willis Bristol, Treas., in trust—120 shares—$12,000."

And on March 26th, 1873, he became by purchase the owner of thirty-four additional shares upon which nothing had been paid. He died in 1875, having paid nothing upon any of them; (leaving out of view the votes concerning a dividend and an installment of twenty-three per cent. hereafter to be mentioned.) Prior to the close of 1876, all

claims presented within the time limited having been paid, his remaining estate was distributed.

In November, 1878, the company having been judicially declared insolvent, the court appointed the plaintiff its receiver, ordered him to call for the entire amount due upon the shares, payment to be made to him on or before March 15th, 1879. Upon January 13th, 1879, the defendants, as executors of Willis Bristol, were duly required to pay the full amount due upon two hundred and fifty-four shares, with interest, on or before March 15th, 1879. No part of it being paid the receiver instituted this suit. The case is reserved for our advice to the Superior Court as to the judgment to be rendered.

First, as to the subscription of Willis Bristol, treasurer.

After subscriptions had been made and accepted by the corporators to the amount of $113,000, Mr. Bristol, in good faith, made a further and final subscription in the following form:—" Willis Bristol, Treasurer, in trust—120 shares— $12,000." Directors were at once elected, the majority of whom were the same persons who had just been acting as corporators, and the directors at once elected Mr. Bristol treasurer. Having knowledge of this subscription and that Mr. Bristol intended it for the company itself and not as his individual subscription, they allowed it to stand during the solvency of the company as made. While he was living they called for an installment of twenty-three per cent. upon $110.000 of the capital and declared a dividend of the same per cent. upon that amount of the capital, but did not include him, so far as this stock was concerned, in either the call or the dividend; and in a vote passed while he was living they recognized the making of the subscription to have been an act done in behalf of the corporation. These acts, performed before the issuing of any policy, constituted an acknowledgment, an acceptance, of the subscription as made in its behalf; a ratification, an adoption of it as its own. If the company had no power to thus subscribe for its own stock that fact does not make it a case of want of authority on his part. He was not making himself person-

ally liable by assuming to act with authority when he had none. The authority, as between himself and the company, if incomplete at the time of the subscription, was made complete by the ratification; and neither the company while it was solvent, nor its receiver in insolvency, could hold Mr. Bristol liable individually upon the subscription.

On May 10th, 1872, the American Mutual Life Insurance Company, a corporation located at New Haven, was by the commissioner of insurance declared to be insolvent to an amount exceeding $48,000, and prohibited from issuing new policies. Its board of trustees had previously received legislative permission to " establish a guarantee capital or fund, not to exceed the sum of $100,000 at any one time, in approved notes, and the same shall be negotiated or assessed only for the purpose of paying claims against said company, and if it shall be necessary at any time for the board of trustees to assess, negotiate or collect any part or portion of said notes, the amount thus obtained shall be refunded and be paid out of the first surplus receipts of said company, with interest at the rate of six per cent. per annum."

On March 15th, 1873 a guarantee capital amounting to $75,000 was established in accordance with these provisions, subscriptions to which were made and received subject to the terms of the charter, and to an agreement between the company and the subscribers that " it shall not be used or resorted to unless all the resources of said company are exhausted," and that the assets pledged for the payment of subscriptions should be surrendered on December 15th, 1875.

On March 22d, 1873, the American Mutual Life Insurance Company transferred its assets to the American National Life & Trust Company, and the latter accepted them and agreed to pay all debts due from the former. The transfer included the subscriptions to the guarantee capital.

On May 17th, 1873, the directors of the American National Life & Trust Company voted " that an installment of twenty-three per cent. on $110,000 of the capital stock of this company is hereby required to be paid to the company on or before the 5th day of June, 1873;" also

"that a dividend of twenty-three per cent. from the surplus of this company be and is hereby declared to be paid to the holders of $110,000 of the capital stock, payable on the 5th day of June, 1873."

On that day the company was insolvent, unless the guarantee capital of $75,000 transferred to it by the American Mutual Life Insurance Company was an asset. This it clearly was not. In its creation by express contract it was merely a loan by shareholders to an insolvent corporation; if the insolvency continued and proved fatal they were to lose it; if success restored solvency they were to receive it back from the first surplus earnings; and the corporation was barred from any application or use of the money borrowed except for payment of losses upon policies. The American National Life & Trust Company received it with all these limitations; if not needed and used to pay losses upon policies it was to repay; if used for losses it was to repay the moment it had sufficient surplus earnings; to neither corporation could it ever be anything but a debt; a dividend from it was alike financially and legally impossible and therefore void; and the complemental vote that this dividend should pay an installment upon the shares was equally impossible and void.

Was the claim legally presented?

It appears that the Superior Court in New Haven County, at its January term, 1879, upon the application of the insurance commissioner, made an order that payment of all subscriptions to the stock of the company should be made to the receiver on or before the 15th day of March, 1879, of which order the receiver was to give notice to the stockholders on or before the 15th of January, 1879; and that the receiver on the 13th of January enclosed a certified copy of this order to the executors of Willis Bristol, with a written demand for payment of the subscriptions made by the deceased on or before the day fixed by the order for payment. The statute provides that "when a right of action shall accrue after the death of the deceased it shall be exhibited within twelve months after such right of action

shall accrue, and shall be paid out of the estate remaining after payment of the debts exhibited in the time limited." Gen. Statutes, p. 388, sec. 5. The defendants claim that here no right of action had accrued, and that none could until the 15th of March, 1879, when by the order the subscriptions were to be paid, and that a presentation of the claim in January could not be within twelve months after the right of action accrued. But the notice gave definite information as to the origin, nature, amount and time of payment of the claim. It is putting altogether too narrow a construction upon the statute to hold that the claim must have actually matured. The presentment to an executor of an obligation before, is a presentment at maturity.

The Superior Court is advised to render judgment for the plaintiff for the amount of one hundred dollars per share upon one hundred and thirty-four shares standing in the name of Willis Bristol individually, with interest.

In this opinion the other judges concurred.